# EXHIBIT A

EEOC # 410-2022-00159

**Name:** Heath C. Holcomb

**Address:** ▇

Dawsonville, GA. 30534

**Phone:** ▇

**Email:** ▇

**Purpose:** *I want to file a charge.*

**Employer:** City of Alpharetta

2 Park Plz.

Alpharetta, GA. 30009

**Date of last employment:** 10/8/2021

**Charges:** Retaliation, discrimination based on race, age, and gender.

On 10/8/2021 I was terminated by the Alpharetta Police Department. I was terminated as retaliation for opposing the disparate treatment of employees based on race, gender and age. I opposed the Department's treatment of employees by discrimination in their promotion process, disciplinary actions and selection for specialized positions. Chief Robison then filed a complaint on me in order to prevent a whistleblower from being able to speak out against their unlawful actions. I have been vocal in opposing Chief Robison and his Executive Command Staff's unlawful discrimination and about being nothing more than a good old boy system.

I was singled out for being in opposition of the discrimination within the Alpharetta Police Department. The discipline was unfair and disproportionate to the infraction I was terminated for. Additionally, Chief Robison did not follow the City of Alpharetta Human Resources policy. As further proof that Chief Robison simply wanted me gone because of my age and support for others who were mistreated or discriminated against by leadership, the City of Alpharetta violated its own rules when it terminated me in violation of Rule 04-03, XI B. This Rule requires, "All employees, members, or officers shall be granted an administrative hearing, interview, or informal conference in the presence of the Director of Public Safety to present his/her arguments why this action should not occur. He/she shall be notified of the hearing in writing by the notification of dismissal, the reason(s) and the effective date." I was never given written or other notice of the hearing by notification of dismissal. Lt. Holcomb was merely handed the dismissal letter at a meeting with Chief Robison and was never given an opportunity to be heard or to evaluate the charges in order to prepare to challenge the basis for the dismissal because he was not

US EEOC Atlanta District Office
Received 03/30/2022

given the dismissal and the basis for same until he was at the meeting. This does not comply with the City's own Rules.

- I supported Sgt. Bradford, an African American, who was demoted and replaced by a white male who was far less qualified.
- I supported several members of the Alpharetta Police Department following their mistreatment or the discrimination against them. For example:
- I was aware of fellow officers who have heard Chief Robison speak about getting rid of "older" officers, such as myself.
- I supported African-American Officer Jason Anderson when he was treated unfairly in regards to a minor accident and punished more severely than similarly-situated white officers.
- I supported Officer Swerdlove, who was treated unfairly in regards to promotions based on his age.
- I supported Officer Castro, an African-American female officer terminated unfairly in regards to a verbal domestic situation when a similarly situated white officer was not even punished for an even worse domestic incident.
- I supported Lt. Robert Heath, who was mistreated unfairly based on his age in relation to certain assignments, where Officer Heath was essentially forced to retire because of these assignments.
- I supported Officer Howard Miller, who would fall into the category of the "older" officers Chief Robison and others in leadership were attempting to get rid of. Officer Miller was also utilizing Lt. Holcomb for his peer to peer counseling. APD leadership went out of its way to put Officer Miller in a position where he eventually resigned due to the lack of accommodation and outright discrimination against him.
- I opposed the promotion and discipline processes for being completely subjective and nothing more than a good ole boy system.
- I opposed the discipline of Det. Maciel, white male, who was treated more favorably than others even after committing a criminal act by stealing evidence. He received no discipline.
- I opposed favorable treatment of Sgt. Carter, white male, who was involved in the above noted incident involving Det. Maciel as well as failing to supervise and placing officers in danger during operations.
- I opposed the improper investigation of an unjustified use of force by Officer Esposito, white male, against an African American suspect where the suspect as bit by the officer's K9.
- I opposed the improper investigation of an unjustified use of force by Officer Lawrence, white female, who jumped the chain of command with her complaint by not notifying the Captain or Major and made false allegations against me when I discovered the incident. The unjustified use of deadly force was completely covered up by Chief Robison.

Here are the facts of my termination:

On or about in the year 2010 or 2011, the Alpharetta Police Department began utilizing Apple products, it was recommended and/or possibly required (I cannot remember the exact wording) through the IT Department to download and utilize a personal Apple iTunes account for the issued City of Alpharetta

US EEOC Atlanta District Office
Received 03/30/2022

devices. It was later discussed by multiple members of the Department's Command staff that the issued phones could be used for personal use. I specifically remember Director Gary George and Captain Tom Patton saying so. More recently, Major Mechler knew I used the phone for personal use as he and I often go fishing together and there are several pictures of us fishing on the phone. There were several reasons given as to why I was issued a cellular device and required to have it with me at all times. I know it has been an accepted practice for several members of the Department since that time. I did not stop using a personal phone until years later, on or about 2013. Also it has become common practice for the department issued phone numbers to be released to the officers when they leave the Police department.

On September 15, 2021 I was notified of an internal investigation against me which was initiated by Officer C. Lawrence for unfair/retaliatory treatment. This complaint stemmed from an incident where she had an unjustified use of deadly force, failed to report to her supervision, committed failure of duty and had multiple officer safety concerns. She clearly placed an unarmed elderly man in danger of being shot. I, along with the D-Squad Sergeants, met with Officer Lawrence to discuss the matter on September 8, 2021 around 0200 hours and the meeting lasted approximately an hour and a half. I explained I would recommend remedial training to Officer Lawrence that would be handled on the Squad level. I then explained that since it was late in the shift and I had other duties to complete, I would complete the performance plan on my return to work September 15, 2021 since I had planned PTO between those dates.

On September 14, 2021, I received a text message from Sgt. Hull stating that Officer Lawrence had requested the 15th and 16th of September off due to a class she had been scheduled to attend being cancelled. He did not grant the request off for the 15th off due to a manpower shortage but granted the time off for the 16th.

Before returning to work for the shift on September 15, 2021 I received notification that Officer Lawrence had been transferred to another shift and was granted the time off by Chief Robison. I expressed my dissatisfaction with the decision to the internal affairs investigator and my chain of command that Officer Lawrence was receiving special treatment and attempting to retaliate on me for holding her accountable for the gross violations of the previously described incident. I also expressed that I was being retaliated against. I also asked what to do regarding the performance plan I was going to draft in reference to the unjustified use of deadly force. I was told to just hold off on it.

When I was interviewed by Lt. Jones about the complaint by Lawrence, Lt. Jones asked if I had any questions at the end. I asked why he was investigating the complaint. Lt. Jones said, "I don't know. This isn't what I investigate. I investigate policy violations. This is a Human resources complaint. But Chief (Robison) told me to take it." I then said I wanted it on record that I was being retaliated against. I then asked what will happen to Lawrence when it is found she falsely accused her superior. Lt. Jones then said, "You'll have to ask the Chief (Robison)."

On September 30, 2021, I received notification that the complaint from Officer Lawrence was found unsustained. Which I had thought was already finished since the she had been transferred. As I received

US EEOC Atlanta District Office
Received 03/30/2022

the notification of the unsustained complaint I was informed that another complaint had been generated against me by Chief Robison for failure to supervise based on new information. This was a complete lie by Chief Robison I just did not know not at the time. But the complaint by Officer Lawrence included my condoning of my squad to meet up throughout the shift. And that complaint was already found unsubstantiated by Lt. Jones.

Since Robison was not following the Police Department policy and allowing me to review the complaint, I did not pursue the retaliation complaint or grievance through Human Resources. I did not see the complaint until I received it through Open records weeks after my termination.

I was then notified that I was being placed on administrative leave and required to turn over my credentials, weapons and cellular phone. I did as requested. Subsequently, I was asked by Lt. Jones to provide the best number where I could be reached. I explained that I did not have another phone. I also had recently moved and had no home phone. I was eventually given a loaner phone in order to be able to be contacted. I was then driven home by Captain Simpson who was also present while I met with Lt. Jones. At no time during this interaction did either state that I was not allowed to use the department issued phone as my only contact number.

On October 5, 2021, I received a text message from Lt. Jones stating, "Hey I need your iTunes password for your Apple devices." I then called Lt. Jones and explained that there was no way I could remember the password since it had been set up so many years ago. Lt. Jones said he was just planning to print out some things from the App WhatsApp but could just make screen shots with his phone. That App has been used by the squad to communicate among members and was open on the phone.

Later that day I had to call Lt. Jones and ask him to send me a verification code from the phone for my personal bank account. As stated previously, I had been told multiple times and it is a common practice for members of the department to use their issued devices as their own and contain personal information. As many department members have on their issued phones, my phone has my banking information, my medical history information, my children and wife's medical information, my children's school information, credit cards, etc.

I was told by Lt. Jones originally that I would most likely be called in for my interview in reference to the Internal Affairs complaint on October 6, 2021. It was later pushed back to October 7, 2021. I was eventually contacted by Chief Robison on October 7, 2021 to meet at City Hall in the upstairs conference room on October 8, 2021 at 0930 hours.

On October 8, 2021 I met with Chief Robison, Major Lindgren and HR Director Cris Randall. Chief Robison explained the reason for the investigation was that I condoned members of D-Squad meeting up for meals, coffee breaks and for other informal meetings in parking lots. He stated that through the AVL system that there was an average of some officers meeting up around 4 hours during their shift. He then stated that through the investigation of the squads informal meetings, he found text messages from individual conversations between me and two people who are not members of my squad, and one is not an employee. The messages were stated by Robison as being somewhat critical of the Departments command staff, but nothing specific and the context is not clear.

US EEOC Atlanta District Office
Received 03/30/2022

Chief Robison then referenced another conversation via text containing pictures of the Chief and Major where I requested he make a picture like the Freeman picture. I have attached the Freeman picture which is completely harmless and actually a great picture. Chris Harrison then sends a picture with the Chief and major where he took their faces and placed them on Mount Rushmore. I responded, "Awesome!" He then sent the picture as described in my termination letter with two males who seem to be committing an act of sodomy with the Chief and Major's faces superimposed on the males. Chief Robison then read my responses.

Chief Robison then said, effective immediately I was terminated from employment with the City of Alpharetta. I was not given a chance to explain or respond to any of the allegations.

Below is my response to the termination and my appeal to City Manager Bob Regus:

Chief Robison explained that he initiated an investigation in response to me condoning members of my squad meeting throughout their shift for coffee breaks and to sit in parking lots for extended periods of time. There are several reasons why I condone this behavior.

I am and have been for several years an advocate for our officer's mental health and wellbeing. I have also been a Training Instructor and Field Training Officer with an extensive history of teaching officer safety and tactics. I am a State certified Peer to Peer Counselor. I am a member of the Alpharetta Department of Public Safety Peer to Peer Counseling Team. A daily goal for me and my squad is to complete the shift safely and to be able to go home without injury or worse.

I regularly and openly discuss in roll call the need to be there for each other and often end our roll call with the statement, "Let's police ourselves and each other." The members of my squad know this statement refers to the mental health of our officers, the physical safety of the members of our department as well as the protection of citizens and if another officer is not acting appropriately then another officer needs to step in to protect all parties. These are all topics I have discussed over and over in roll calls. Both Chief Robison and Major Lindgren have been present as I have discussed them.

We, in law enforcement are currently in unprecedented times. We currently are faced with more stress than I have seen in my previous 24 years of service. We are currently in a worldwide pandemic; we have seen nationwide movements of civil unrest, and defunding of police. We have seen local officers terminated and criminally charged or indicted within the jurisdiction we serve. We have seen an increase in assaults on officers nationally. We have seen an increase in officers being ambushed across the country. This is in addition to the normal internal and external stressors that come with our profession, not to mention the individual's personal or family concerns.

At my previous agency my partner and I were ambushed while conducting surveillance which involved a fatal line of duty shooting. I was watching our target location and she was watching our backs. As the assailants approached, she recognized they were armed and alerted me. I was able to engage the attackers and have often said I would not be alive today had she not been watching our backs. So as an officer safety measure, I have stated that officers need to be together to watch over one another's physical safety, especially during this time of increased officer ambushes. I have recommended they do

US EEOC Atlanta District Office
Received 03/30/2022

this and to work in shifts. For instance while officers are working on reports, another or others act as safety officers. This also leads to comradery among the members of the shift.

The mental health and safety of our officers is another compelling reason I condone them meeting during the shift. It allows them some time to decompress and vent. Our officers have concerns of the above mentioned stressors and need an outlet. We lost an officer, Sgt. Clinton Martin, to Covid earlier this year. We are being told there is a deadly virus that is constantly changing and different variants are being discovered on a regular basis. Each of my squad members have expressed to me concerns of possibly unknowingly passing the Covid virus to members of their families. We also have not seen how the new District Attorney will respond should a use of force incident be presented to her. This is a burden they weighs heavily on our minds. The physical threats are always a concern. I believe our officers need time when they can rest mentally and have a safe haven to vent or decompress. We preach to our officers that we are family and my squad truly act and treat each other as such. Right now in particular is not the time to be pushing our officers to put themselves in harm's way unnecessarily.

Sometimes the squad meets to discuss event(s) from earlier in the shift. It is also not uncommon for the sergeants to meet with squad members to make corrections of various kinds and conduct informal training. None of this is mandatory but it is also not frowned upon. Note that my squad still responds to emergencies and normal calls for service and there have not been any citizen complaints against them for poor response times or lack of professionalism.

Building comradery by having meals and shift gatherings has been encouraged and even praised in the recent past such as at Sgt. Martin's funeral by Chief Robison. For these reasons I have stated; the mental health and well-being of our officers, the physical safety of our officers during these unprecedented times, and to build comradery and a family atmosphere I do condone members of the squad meeting up throughout the shift.

As I have stated, I have been a longtime advocate for the mental health of our officers. This began several years ago while being an academy instructor and I have been passionate on the topic. From the time at my previous agency I became a trusted member of the law enforcement community and willing to help out any officer in any way. I was often the go to guy when officers needed to vent. It was well known that I would keep our conversations confidential but willing to help as much as I could. This also became the case when I started my career with Alpharetta DPS. Again I became a highly trusted and respected member of the department who officers knew they could come to with issues. This was even recognized and praised by Chief Robison earlier in the year as he sent out a department wide email praising me, regarding something that was brought to me about the selection process for specialized positions and I addressed with members of the Executive Command Staff.

I regularly field calls and text messages from members of the law enforcement community at all times of the day or night, whether I'm on or off duty seeking help. The State Certification for Peer to Peer counseling places the counselors on a list where they can be contacted by anyone reaching out for help, or to possibly be called out to respond to similar incidents we have experienced to anywhere in the

US EEOC Atlanta District Office
Received 03/30/2022

State of Georgia. I have and continue to be contacted by officers from inside the Alpharetta Police Department as well as law enforcement officers from outside agencies.

The Peer to Peer program has been informally available for members of the department for years. In January 2020 several of us received our State certifications to become counselors. The program became official after we received our certifications. The program has been endorsed by Chief Robison. There is a white board in the Alpharetta Police Headquarters roll call room advertising the Peer to Peer program advocating for members of the department to reach out to these counselors if they need someone to talk to. I happen to be an individual contacted on a regular basis by officers inside and outside the Alpharetta Police Department.

As stated previously, the department issued devices had been previously encouraged to be used by members of the department. The Department issued device is all I have had for several years and has been distributed professionally and personally as my way of being contacted. I became a State certified instructor in 2002 with several specialized instructor certifications. I have taught classes all over the State of Georgia. I have made contact with thousands of law enforcement officers from all over the State of Georgia.

As a State certified Peer to Peer counselor conversations with clients are protected as confidential information under GA Code 24-5-510 (2014), Privileged communications between law enforcement officers and peer counselors. Officer Bradford has been a long time client where he and I have discussed a wide range of topics and helped him regularly. Several other officers from inside and outside agencies have contacted me to discuss all types of stressors. As a Peer to Peer counselor I am actually helping to promote a positive work environment by being listening, counseling, or just having a conversation with a client rather than officers making statements of frustration or dissatisfaction in public.

Chris Harrison is a former law enforcement officer and employee of the Alpharetta Police Department. He and I started our employment with the City of Alpharetta around the same time. Chris Harrison had previously been in the U.S. Army and received a Purple Heart for an injury he received in combat in 2004. In 2007 Officer Harrison was involved in a line of duty shooting. Upon hearing of the shooting incident, I reached out to Harrison and offered support since I had been involved in a line of duty shooting at my previous agency.

Harrison and I began our relationship as an informal peer support relationship. As our relationship grew through peer support and working with him as a firearms and tactics trainer, then later as a SWAT trainer he began to confide in me more and more. I became the person he trusted to vent to and would often be the person he would seek advice from. Harrison separated from the department in 2016 but I continued to be a peer support for him and an outlet for him to vent. I recognized he needed a confidant and continued to be there for him. He currently receives full benefits from the U. S. Army and is medically retired for PTSD and physical injuries. I am still always available for him. I will not turn my back on a disabled combat veteran and former officer.

The picture I requested Harrison to replicate referring to Freeman (attached) was made by him several years ago when Freeman had just been selected to the SWAT Team and has circulated among members

US EEOC Atlanta District Office
Received 03/30/2022

of the SWAT Team since then. It depicts Freeman in full SWAT gear with Jesus Christ riding a T-rex with machine guns attached to it's head, there are laser beams being shot back and forth, and there are other dinosaurs and volcanos in the background. The picture is extremely over the top and comical. That's what I requested he make. He first sent the picture of Mount Rushmore. I did not solicit the other picture. I did find it funny and did make an immature comment in response. For that I am regretful. But I did not put the picture out on social media or display it in any public forum. I was simply in the moment of something I knew was nothing more than a joke and I am truly sorry.

It is well known in the police culture that a coping mechanism for stress and anxiety is humor. It is also well known in the police culture that the humor is crude, vulgar, extreme and over the top. The picture that was sent was an obvious joke and the comments in response were as well. There was no malicious intent and it was not distributed nor was any harm intended. It was simply some back and forth humor to decompress.

I do not believe this infraction justifies termination. There has been no progressive discipline afforded to me. I have an exemplary record in my nearly 25 year career with two law enforcement agencies. In fact I have a highly decorated career. I have received countless commendations for a wide variety of actions. I have received Supervisor of the Year twice since being employed by the City of Alpharetta. In 2020 I was nominated for Supervisor of the Year again by a department member outside my direct supervision. I have always received favorable annual evaluations, and when reviewing the 2020 evaluation with Captain Stewart, he stated I had the highest evaluation he has ever seen.

I also have a history of doing what Chief Robison has stated as our mission to, "Make it better." For example, as a new member of the department I was assigned to the Training Division where I made it better. It is widely acknowledged that since I was reassigned from the Training Division after being promoted, the departmental training has not been up to that level. I was promoted in July of 2013 and asked to develop and supervise the Special Investigations Unit (SIU). While supervising SIU we regularly made large narcotics seizures, large cash seizures, made drug trafficking arrests, worked undercover operations rescuing victims of human trafficking and arresting their exploiters. The results of SIU have not been anywhere near the results while under my supervision after I was transferred to the Uniform Patrol Division (UPD) in 2019. For example, SIU averaged pulling a case number per shift for some form of proactive incident under my supervision, since then the SIU may pull a case number an every 6-8 weeks.

When I was moved to UPD, Major Mechler stated that it was due to the department needing my leadership in UPD. Since then I have worked with my chain of command and the peer watch commanders to bring UPD to being uniform across the shifts and squads. This was cited in my evaluations. It is widely known that UPD is more uniform than ever before. I have a history of making it better.

In the same conversation with Major Mechler from when I was reassigned to UPD, we discussed where other Lieutenants were being moved and why. Specifically he stated that Lt. Woods, paraphrasing, was known for being so negative and openly talking so much trash about everyone and everything in the

US EEOC Atlanta District Office
Received 03/30/2022

department that we (the Executive Command Staff) have to put him where he has the least amount of contact with employees and can do the least amount of damage. Lt. Woods' behavior is well known by members of all ranks of the department from. Lt. Woods was not disciplined for this behavior; in fact he was recently promoted.

I am appealing my termination for several reasons. Chief Robison stated he was investigating me for failure to supervise based on me condoning members of my squad meeting for coffee and sitting in parking lots. I have stated the reasons for condoning this as to improve comradery, improve officer's physical safety, and to allow a safe haven to vent and improve their mental health and wellbeing. But based on the reason he stated for the investigation, there would be no reason to investigate personal conversations with individuals who are not on my squad. As a State certified Peer to Peer counselor those conversations are privileged and protected as confidential by Georgia State law.

The City issued cell phone has long been established as being allowed for use as a personal device. By requiring members to install personal accounts and Apps not only is it allowed but encouraged and possibly mandated. There was no reason to investigate personal conversations with individuals who are not part of the reason for the investigation.

Although I did make an immature and disrespectful response to an obvious joke in a personal conversation, I was not offered any opportunity to respond or any form of progressive discipline. The punishment (termination) simply does not fit the crime.

After the initial investigation by initiated by C. Lawrence was unsustained or unsubstantiated, the following investigation for failure to supervise could have been easily cleared up by interviewing me and members of my squad on the specifics of the investigation. Instead, I was placed on administrative leave and ordered to turn over my issued devices, credentials, and weapons. I will also note it is not common practice to search individual's devises and view personal conversations that are not involved in the investigation.

I believe the investigation and eventual termination is in retaliation against me for opposing the department's disparate and unfair treatment of employees of protected individuals based on race, gender and age. I believe Chief Robison used the allegation of condoning my shift's behavior as a pretextual reason to search my personal communications to find a fault and keep me and my influence within the department to prevent evidence against their unlawful actions by terminating me. It was a "fishing" expedition to prevent a whistleblower from being able to speak.

Finally, I will show the facts of being singled out as retaliatory. Following my termination Capt. Simpson open stated in roll call on 10/21/2021 that it was not a common for Internal Affairs to search employees' phones during investigations. This is still the case. No other officer's department issued phones have been searched. Two examples are Lt. Davis and Lt. Furr, equal in rank to me, did not have their phones searched.

US EEOC Atlanta District Office
Received 03/30/2022

On 11/8/2021 Officer Lebron, Latin American, filed a complaint of discrimination to Alpharetta Human resources against Sgt. Miller and Lt. Davis. The complaint is very specific that racial slurs from Sgt. Miller were condoned by Lt. Davis. However, not only was Lt. Davis' phone not searched, he was never investigated and the matter was not addressed for Officer Lebron. That is a true failure to supervise by Lt. Davis. Officer Lebron eventually was coerced into resigning and only did so under duress. The difference is Lt. Davis has not opposed the discrimination in the Alpharetta Police Department.

In Feb, 2022, Lt. Furr was investigated for making an unlawful arrest and violating a citizen's 4th Amendment Rights. He was not terminated, only receiving a two day suspension. Additionally, Lt. Fur did not have his phone searched. Lt. Furr committed a far more severe violation than me and was suspended. The difference is he has not opposed the discrimination in the Alpharetta Police Department.

Also, I requested a meeting with City Manager Bob Regus to discuss the discrimination within the Alpharetta Police Department but unfortunately he never responded to the request.

I am compelled to file this complaint in order to put an end to the discrimination in the Alpharetta Police Department. I care too much about the members of the department's protected classes and the members in general as well as the citizens of the City of Alpharetta to just stand by and wacth it continue.

Sincerely,

*[signature]*

Heath Holcomb

US EEOC Atlanta District Office
Received 03/30/2022